J-S27028-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE MATTER OF THE ADOPTION OF: W.B.G. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.S., NATURAL MOTHER | : | |
| | : | No. 1553 WDA 2018 |

Appeal from the Decree Entered September 26, 2018
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): 66A In Adoption, 2018

| IN THE MATTER OF THE ADOPTION OF: K.N.G. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.S., NATURAL MOTHER | : | |
| | : | No. 1554 WDA 2018 |

Appeal from the Decree Entered September 26, 2018
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 66 in Adoption, 2018

| IN THE MATTER OF THE ADOPTION OF: A.R.G. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.S., NATURAL MOTHER | : | |
| | : | No. 1555 WDA 2018 |

Appeal from the Decree Entered September 26, 2018
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): 66B In Adoption, 2018

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:                          FILED MAY 31, 2019

N.L.S. ("Mother") appeals from the decrees entered September 26, 2018, which involuntarily terminated her parental rights to her minor children, K.N.G., a female born in November 2014, W.B.G., a male born in March 2017, and A.R.G., a female born in February 2018 (collectively, "the Children").[1] After careful review, we affirm.

The record reveals that the Erie County Office of Children and Youth ("OCY") became involved with this family in March 2017, around the time of W.B.G.'s birth.  N.T., 8/17/18, at 107.  Mother had tested positive for opiates several days prior to W.B.G.'s birth and tested positive for benzodiazepines, opiates, and marijuana on the day he was born.  Id.  W.B.G. suffered from drug withdrawal symptoms, which required monitoring at the hospital for five days.  Id. at 107-08.  OCY discovered that Mother abused drugs throughout her pregnancy and did not receive prenatal care.  Id. at 108.  Mother claimed that she did not receive prenatal care because she did not realize she was pregnant until December 2016.  Id. at 109.  Father also suffered from a drug addiction and neither parent provided appropriate care for W.B.G. while he

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered separate decrees involuntarily terminating the parental rights of K.S.G. ("Father").  Father appealed the termination of his rights as to A.R.G. only.  We address his appeal in a separate memorandum.

remained in the hospital.  Id. at 108.  The parents did not attempt to care for W.B.G. when he cried, and left the hospital for extended periods.  Id.  Due to safety concerns, hospital staff removed W.B.G. from Mother's room.  Id.  OCY obtained emergency protective custody of both W.B.G. and K.N.G., and the juvenile court entered shelter care orders.  The court adjudicated W.B.G. and K.N.G. dependent on March 29, 2017.

Mother initially began receiving reunification services through Corry Counseling's Family Preservation program.  Id. at 45, 50-51.  Mother failed to attend the program consistently.  Id. at 46.  In addition, Mother was not receiving visits with the Children, due to her positive drug screens.  Id. at 47, 54, 119, 128.  Based on these circumstances, Corry Counseling was unable to assist Mother and discharged her on September 12, 2017.  Id. at 47.  Mother received further reunification services from Time Limited Family Reunification beginning on December 20, 2017.  Id. at 58.

Meanwhile, OCY referred Mother to the Erie County Family Dependency Treatment Court.  Id. at 73.  Mother failed to attend her orientation in June 2017.  Id.  Treatment Court rescheduled Mother's orientation for July 2017 and she attended successfully.  Id. at 74.  However, Treatment Court rejected Mother due to her failure to participate consistently in drug screens.  Id. at 75.  In October 2017, Mother began participating in inpatient drug and alcohol treatment at the House of Healing.  Id. at 135.  Treatment Court subsequently reassessed Mother and accepted her in November 2017.  Id. at 76.  At first,

Mother did very well at both the House of Healing and Treatment Court. Id. at 77. The House of Healing discharged Mother successfully in January 2018. Id. at 78. At the time of Mother's discharge, Treatment Court recommended that she transition to Community House. Id. at 77. Mother, however, was adamant that she wanted to return home, so Treatment Court recommended that she attend outpatient treatment at Gaudenzia instead. Id. Mother began attending treatment at Gaudenzia on January 23, 2018. Id. at 29-30.

In February 2018, Mother's progress declined dramatically. Id. at 78. Mother gave birth to A.R.G. prematurely, at which time she tested positive for opiates, benzodiazepines, and cocaine. Id. at 32, 78, 114-16. In addition, during her hospital stay, Mother requested drugs that she was not prescribed. Id. at 116. The juvenile court removed A.R.G. from Mother's care and entered a shelter care order.[2] The court adjudicated A.R.G. dependent on March 7, 2018.

While Mother was still in the hospital, the House of Healing conducted a reassessment and concluded that it would be inappropriate for her to return to the program, given that she had not utilized what she learned in treatment the first time. Id. at 117. Mother proposed that she should attend drug and alcohol treatment at ARS, but Treatment Court informed her that ARS was not

_____

[2] A.R.G. resides in the same foster home as W.B.G. and K.N.G.

an acceptable program.[3]  Id. at 78.  Treatment Court recommended inpatient treatment, which Mother declined.  Id. at 88.  In response, Treatment Court recommended a partial hospitalization program instead.  Id. at 80.  Mother agreed to attend a partial hospitalization program while at Treatment Court but later refused and attended ARS.[4]  Id.  Treatment Court discharged Mother on March 29, 2018.  Id. at 81.  Mother wrote a letter to the Treatment Court judge, asking to return to the program, but the judge denied her request.  Id. at 89.  At the same time, Mother was failing to attend her outpatient treatment at Gaudenzia, which discharged her on March 6, 2018.  Id. at 31, 80.

_____

[3] OCY caseworker and Treatment Court liaison, Kristen Heise, testified that treatment through ARS was not acceptable because "[t]hey don't provide the appropriate counseling that we would like to see. . . . [W]hat they do is they give you a 30-day script [for Suboxone] and send you on your way."  N.T., 8/17/18, at 79.

[4] In addition, Mother received a referral to the Center of Excellence at Esper Treatment Center for further drug-and-alcohol-related services in February 2018.  N.T., 8/17/18, at 13.  According to Center care manager, Nicole Corbitt, the purpose of the services is to "ensure effective coordination integrating physical, [and] behavioral needs for every patient with an opioid use disorder."  Id. at 7.  Moreover, the Center "increase[s] access to medication assisted treatment, including Methadone, Suboxone, and Vivitrol."  Id.  The Center did not succeed in contacting Mother until March 2018.  Id. at 13-14.  The Center scheduled an appointment with Mother for March 16, 2018, but she appeared three hours and forty-five minutes late.  Id. at 9, 14.  A staff member from the Center met with Mother on three occasions after that initial appointment but Mother made no progress.  Id. at 14-16.  Mother then failed to attend an appointment scheduled for May 18, 2018.  Id. at 16.  The Center made several unsuccessful attempts at reengaging Mother before discharging her on June 20, 2018.  Id.

As Mother's progress toward sobriety deteriorated, so too did the other circumstances of her life. Mother informed OCY that she was going to become homeless and that she would be staying with her parents. Id. at 117-18. Troublingly, Mother also reported that she would likely relapse if she had to stay with her parents. Id. at 118. Mother was evicted from her residence on May 17, 2018, due to nonpayment of rent. Id. at 122. Mother was also facing two active retail theft charges resulting from incidents that took place in 2016 and 2017.[5] Id. at 121-22. She was arrested on May 30, 2018, due to both her outstanding criminal issues and her failure to pay child support for A.R.G. Id. at 121-22, 128. The juvenile court changed the permanent placement goals of all three Children to adoption on June 1, 2018. Following the goal change, Time Limited Family Reunification ended services with Mother and her visitation with the Children ceased. Id. at 60, 152.

On June 22, 2018, OCY filed petitions to involuntarily terminate Mother's parental rights to the Children. The orphans' court held a termination hearing on August 17, 2018, and September 21, 2018.[6] On September 26, 2018, the

_____

[5] Mother was facing various summary charges as well. N.T., 8/17/18, at 123; Petitioner's Exhibit 18 (Magisterial District Judge docket).

[6] The orphans' court appointed Catherine Allgeier, Esquire, to serve as the Children's legal counsel. Ms. Allgeier also served as the guardian ad litem for the Children during the dependency proceedings. The record indicates that K.N.G. was just under four years old at the time of the termination hearing, while W.B.G. was one and a half years old, and A.R.G. was seven months old. Thus, the Children were too young to state their preferred outcomes in this

court entered decrees terminating Mother's rights.  She timely filed notices of appeal on October 26, 2018, along with concise statements of errors complained of on appeal.[7]

Mother now raises the following claims for our review:

1. Did the orphans' court commit an abuse of discretion or error of law when it concluded that [OCY] established sufficient grounds for termination under 23 Pa.C.S.A. § 2511(a)(1)?

2. Did the orphans' court commit an abuse of discretion or error of law when it concluded that [OCY] established sufficient grounds for termination under 23 Pa.C.S.A. §[]2511(a)(2)?

3. Did the orphans' court commit an abuse of discretion or error of law when it concluded that [OCY] established sufficient grounds for termination under 23 Pa.C.S.A. §[]2511(a)(5)?

_____

case.  See In re T.S., 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that a guardian ad litem may represent both a child's legal and best interests so long as the two sets of interests do not conflict, and that no conflict can exist when a child is very young and pre-verbal, and his or her preference is incapable of ascertainment).  To the extent the Children were capable of expressing their preferred outcomes, both K.N.G. and W.B.G. refer to their foster parents as their "mom and dad" and K.N.G. recently referred to Mother using her first name and stated that she did not want to visit her anymore.  N.T., 8/17/18, at 124, 129, 159-60.  Ms. Allgeier supported the termination of Mother's rights during the hearing.  N.T., 9/21/18, at 5.  Ms Allgeier did not file a brief on appeal but did submit a letter repeating her support for termination and joining OCY's brief.

[7] On May 16, 2019, OCY filed in this Court a motion to file response nunc pro tunc, in which it averred that it had missed the deadline for filing its brief in this appeal inadvertently, and requested permission to adopt the reasoning of the orphans' court as its own.  OCY is mistaken, as it filed a brief on February 4, 2019.  It seems likely that OCY intended to file its motion in Father's appeal.  Among other things, OCY did not file a brief in Father's appeal, and identified Mother in its motion as "K.G.," which is Father's name.  Nonetheless, because OCY timely filed a brief in the instant matter, we deny its motion as moot.

4. Did the orphans' court commit an abuse of discretion or error of law when it concluded that [OCY] established sufficient grounds for termination under 23 Pa.C.S.A. §[]2511(a)(6)?

5. Did the orphans' court commit an abuse of discretion or error of law when it concluded that [OCY] established sufficient grounds for termination under 23 Pa.C.S.A. §[]2511(a)(8)?

6. Did the orphans' court commit an abuse of discretion or error of law when it concluded that termination of [Mother's] parental rights was in the Children's best interests under Section 2511(b)?

Mother's brief at 6 (orphans' court answers and unnecessary capitalization omitted).[8]

We review Mother's claims in accordance with the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

_____

[8] In its opinion, the orphans' court suggests that we should find Mother waived her claims because her concise statements of errors complained of on appeal were vague and overly broad. Orphans' Court Opinion, 11/29/18, at 13-14. While we agree with the court that Mother's concise statements lacked detail beyond challenging in general terms the sufficiency of the evidence supporting the termination decrees, this is a relatively straightforward appeal. Mother's concise statements were sufficient to inform the court of the claims she wished to raise and the court was able address those claims thoroughly in its opinion. Therefore, we decline to find waiver. See Commonwealth v. Laboy, 936 A.2d 1058, 1060 (Pa. 2007) (disagreeing with the Superior Court's finding of waiver in a "relatively straightforward drug case" where the trial court "readily apprehended Appellant's claim and addressed it in substantial detail").

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. See 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to K.N.G. and W.B.G. pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). The court terminated Mother's parental rights to A.R.G. pursuant to Sections 2511(a)(2), (6), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), appeal denied, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate as to all three Children pursuant to Sections 2511(a)(2) and (b), which provide as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

* * *

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the orphans' court committed an abuse of discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2):

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In this matter, the orphans' court found that Mother received services from numerous providers, but that she failed to remedy her drug abuse and achieve reunification with the Children because of her lack of cooperation and inconsistent attendance. Orphans' Court Opinion, 11/29/18, at 15. Mother initially made progress and completed services at the House of Healing in January 2018. Id. However, she relapsed in February 2018. Id. The court observed that Mother succeeded in controlling her addiction only when she participated in treatment programs that closely monitored her conduct. Id. at 16. Nonetheless, Mother refused to participate in those types of programs. Id. The court concluded:

> . . . . If the proposed service infringed on [Mother's] life in any way, she refused to engage in that service. There is perhaps no greater infringement on one's lifestyle than properly raising and caring for children. [Mother] consistently demonstrated her lack of concern that her life choices could lead to continued and permanent separation from her children. [Mother] was, and is not, prepared to accept the great responsibility to change her lifestyle for her children.

Id.

Mother concedes that she relapsed in February 2018, but maintains that she subsequently remedied her drug abuse. Mother's brief at 16. She asserts that she has not produced a positive drug screen, or failed to attend a drug screen, since shortly after the relapse. Id. at 16-17. While Mother concedes that she tested positive for Suboxone, she asserts that she had a prescription for Suboxone through ARS. Id. at 17. She contends, "the condition that led to the removal of [Mother's] children was her usage of illegal drugs. The drug screenings show that [Mother] was consistently providing negative urine samples. As such, the condition no longer existed at the time of the filings for termination." Id. at 17-18.

We discern no abuse of discretion by the orphans' court. As detailed at length above, Mother was initially able to make progress toward remedying, or at least managing, her drug abuse. Most significantly, Mother participated in Treatment Court and completed her inpatient drug treatment program at the House of Healing successfully. However, she relapsed in February 2018. She failed to comply with the recommendation of Treatment Court that she attend a partial hospitalization program, and further failed to comply with her outpatient treatment, resulting in her discharge from both programs in March 2018. Moreover, Mother was evicted from her housing and was then arrested in May 2018 due to unresolved criminal charges and her failure to pay child support. It is clear that Mother will not be able to achieve the maturity and stability necessary to parent the Children at any point in the foreseeable

future. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa. Super. 2006).

While Mother argues that she remedied her drug abuse, our review of the record belies this claim. During the hearing, Ms. Heise detailed Mother's history of drug screens. N.T., 8/17/18, at 84. Between March 2017 and July 18, 2018, Mother was unable to produce sufficient urine to provide a screen on thirteen occasions. Id. From March 2017 until June 4, 2018, Mother failed to attend sixteen screens. Id. Between March 2017 and May 21, 2018, she submitted forty-two positive screens. From April 24, 2017, until June 7, 2017, Mother submitted three positive dilute screens. Id. Finally, between June 1, 2017, and March 22, 2018, she submitted forty-eight negative screens.[9] Id. Mother's positive screens beginning in March 2018 were positive for Suboxone only, for which Mother claimed to have a prescription through ARS. Id. at 133; Petitioner's Exhibit 11 (drug screen results). However, OCY caseworker, Stephanie Mumford, explained that the only verification she received showing that Mother had a valid prescription for Suboxone was a single picture of a

_____

[9] Mother had one "leaked in transit" screen on May 31, 2017. N.T., 8/17/18, at 84.

medication bottle containing a one-month supply. N.T., 8/17/18, at 132. Ms. Mumford also pointed out that Mother did not test positive for Suboxone on March 16, 2018, or March 22, 2018. Id. at 131. If Mother had been taking the Suboxone as prescribed, she would have tested positive on those days. Id. Significantly, Mother failed to attend drug screens as recently as May 25, 2018, May 29, 2018, May 31, 2018, and June 4, 2018. Id.; Petitioner's Exhibit 11. Thus, Mother's drug abuse remains a serious and ongoing concern. The record supports the conclusion of the orphans' court that Mother is incapable of parenting the Children and that she cannot or will not remedy her parental incapacity pursuant to Section 2511(a)(2).

We next consider whether the orphans' court committed an abuse of discretion by terminating Mother's parental rights to the Children pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of

> continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The orphans' court determined that terminating Mother's parental rights would serve the Children's needs and welfare. Orphans' Court Opinion, 11/29/18, at 17. The court observed that the oldest of the Children, K.N.G., refers to Mother using her first name. Id. K.N.G. has also stated that she no longer wants to visit with Mother. Id. In contrast, the Children are thriving in foster care. Id. at 16. The court found that the Children maintain an "obvious bond" with their foster parents and that K.N.G. refers to the foster parents as "mom and dad." Id. at 16-17.

Mother makes no effort to argue that she and the Children share a bond. Mother's brief at 20-21. Instead, she repeats her previous argument that she remedied her drug addiction. Id. at 21. She asserts, "[s]ince the statutory requirements for termination were not met by [OCY], it was an error of law and abuse of discretion to find that termination of [Mother's] parental rights was in the best interest of the [C]hildren." Id.

We again discern no abuse of discretion. K.N.G. entered foster care in March 2017 when she was just under two and a half years old. By the time of the termination hearing in August and September 2018, K.N.G. was over

three and a half years old. W.B.G. and A.R.G. entered foster care shortly after their births in March 2017 and February 2018, respectively, and remained in care throughout their lives. Mother missed many of her possible visits with the oldest two children, due to her failure to produce negative drug screens. Ms. Mumford, testified that Mother "did not have visitation with [K.N.G.] and [W.B.G.] for an extended period of time, pretty much the whole time before I had gotten the case.[10] So [she] didn't really have to [sic] time to have that relationship with the children." N.T., 8/17/18, at 117. Mother visited K.N.G. and W.B.G. consistently for approximately two months prior to her relapse and the birth of A.R.G. in February 2018. Id. at 119. Following A.R.G.'s birth, Mother's visits became inconsistent once more. Id. at 130. When Mother did attend visits, she often arrived twenty minutes to an hour late. Id. at 126. In addition, Mother and the Children did not appear to share a parental bond. Ms. Mumford recalled that Mother's visits tended to consist of playing games with the Children. Id. at 141. She explained that Mother and Father "would basically act like children and just like play with the [C]hildren, play with the arcade games, like it wasn't very parent/child like." Id. Ms. Mumford also reported a recent incident during which K.N.G. referred to Mother using her first name and stated that she did not want to visit Mother anymore. Id. at 129, 160.

_____

[10] Ms. Mumford began working on the case in January 2018. N.T., 8/17/18, at 107.

The record describes the Children's relationship with their foster parents in a much more positive light. Ms. Mumford testified that terminating Mother's parental rights would not have a detrimental impact on the Children, because they have a very positive relationship with their foster parents and view them as their parents. Id. at 128. K.N.G. in particular refers to the foster parents as her "mom and dad," and refers to the foster mother's parents as her grandparents. Id. at 124. W.B.G. also refers to his foster parents as "mom and dad," although his verbal skills are limited. Id. at 159. While A.R.G. is very young and nonverbal, it is clear that her relationship with the foster parents is much stronger than her relationship with Mother, given that she has lived with the foster parents throughout her life, and given her dearth of contact with Mother. See Matter of Adoption of M.A.B., 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."); In re K.Z.S., 946 A.2d 753, 762-63 (Pa. Super. 2008) ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists."). Thus, the Children share a bond with their foster parents rather than Mother, and terminating Mother's parental rights will best serve their needs and welfare. The record supports the decision of the orphans' court to terminate pursuant to Section 2511(b).

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion or commit an error of law by involuntarily terminating Mother's parental rights to the Children. Therefore, we affirm the September 26, 2018 decrees.

Decrees affirmed. Motion to file response nunc pro tunc denied as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2019